AO 109 (Rev. 11/13) Warrant to Seize Property Subject to Forfeiture

# United States District Court
#### for the
#### District of Arizona

| | |
|---|---|
| In the Matter of the Seizure of: | ) |
| *(Briefly describe the property to be seized)* | ) |
| Bank of America Checking account number | ) |
| 4570-3136-5040 in the name of KC Concepts II, LLC. or | ) |
| any funds known to have previously been maintained in | ) |
| account number 4570-3136-5040 | ) |
| | ) |
| | ) |
| | ) |

Case No. 21- 3110 MB

## WARRANT TO SEIZE PROPERTY SUBJECT TO FORFEITURE

To:   Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests that certain property located in the District of Arizona be seized as being subject to forfeiture to the United States of America.   The property is described as follows:

Bank of America Checking account number 4570-3136-5040 in the name of KC Concepts II, LLC. or any funds known to have previously been maintained in account number 4570-3136-5040

I find that the affidavit(s) and any recorded testimony establish probable cause to seize the property.

**YOU ARE COMMANDED** to execute this warrant and seize the property on or before 6-4-21
*(not to exceed 14 days)*

❑ in the daytime - 6:00 a.m. to 10:00 p.m.   ❑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must also give a copy of the warrant and receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave a copy and receipt at the place where the property was taken.

An officer present during the execution of the warrant must prepare, as required by law, an inventory of any property seized and the officer executing the warrant must promptly return this warrant and a copy of the inventory to United States Magistrate Judge Michael T. Morrissey.

❑ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be search or seized *(check the appropriate box)*

❑ for ___ days *(not to exceed 30).* ❑ until, the facts justifying, the later specific date of _____.

Date and time issued: 5-21-21 @ 3:35 p.m.         M Morrissey
                                                    *Judge's signature*

City and State:  Phoenix, AZ                    Hon. Michael T. Morrissey, U.S. Magistrate Judge
                                                    *Printed name and title*

AO 109 (Rev. 11/13)  Warrant to Seize Property Subject to Forfeiture (Page 2)

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of:

Inventory of the property taken:

| Certification |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

AO 108 (Rev. 06/09) Application for a Warrant to Seize Personal Property Subject to Forfeiture

# United States District Court
for the
District of Arizona

In the Matter of the Seizure of: )  Case No. 21-3110 MB
*(Briefly describe the property to be seized)* )
Bank of America Checking account number 4570-3136- )
5040 in the name of KC Concepts II, LLC. or any funds )
known to have previously been maintained in account )
number 4570-3136-5040 )
)
)
)

## APPLICATION FOR A WARRANT
## TO SEIZE PROPERTY SUBJECT TO FORFEITURE

    I, a federal law enforcement officer or attorney for the government, request a seizure warrant and state under penalty of perjury that I have reason to believe that these bank accounts (a) are or contain property, real or personal, which constitutes or is derived from proceeds traceable to a specific unlawful activity, including but not limited to 18 U.S.C. § 1343 (Wire Fraud), and is property, real or personal, involved in a transaction or attempted transaction in violation of a money laundering offense, including 18 U.S.C. § 1956 and/or 1957 (Money Laundering); (b) are subject to seizure pursuant to 18 U.S.C. §§ 981(b) and 982(b)(1), and 21 U.S.C. § 853(e) and (f); and (c) are subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C) and 982(a)(1), and 28 U.S.C. § 2461 *(describe the property)*:

    Bank of America Checking account number 4570-3136-5040 in the name of KC Concepts II, LLC. or any funds known to have previously been maintained in account number 4570-3136-5040

    The application is based on these facts:

See the Affidavit of Brad Palmer, Special Agent, Internal Revenue Service – Criminal Investigation Division

    ❑ Continued on the attached sheet.

                                                     *Applicant's signature*

MARK WENKER   Digitally signed by MARK WENKER
                  Date: 2021.05.21 12:39:31 -07'00'
Approved by AUSA Mark J. Wenker

                                 Brad Palmer, Special Agent, Affiant
                                       *Printed name and title*

Sworn to before me and signed in my presence.

Date: 5-21-21 @ 3:35 p.m.                             *Judge's signature*

City and State: Phoenix, Arizona                 Hon. Michael T. Morrissey, U.S. Magistrate Judge
                                             *Printed name and title*

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR
## SEIZURE WARRANT

I, Brad Palmer, Special Agent, Internal Revenue Service, Criminal Investigation Division (IRS-CI), Department of the Treasury, having been duly sworn, hereby state that:

### AFFIANT KNOWLEDGE & EXPERIENCE

1. I am a Special Agent with IRS-CI and have been so employed for over nineteen years. Prior to becoming a Special Agent I received a degree in Accounting from the University of Wisconsin Eau Claire. I also attended the Federal Law Enforcement Training Center where I received specialized training in conducting criminal investigations of suspected tax law and money laundering violations amongst other items.

2. Over the years, I have participated in many investigations of alleged violations of the Internal Revenue Laws (Title 26, United States Code), the Bank Secrecy Act (Title 31, United States Code), the Money Laundering Statutes (Title 18, United States Code) and related offenses. I am a federal law enforcement officer engaged in the enforcement of the criminal laws of the United States of America and thereby authorized to request the issuance of federal seizure warrants.

3. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

### ITEMS SUBJECT TO SEIZURE AND FORFEITURE

4. This affidavit is submitted in support of applications for issuance of warrants to seize the following described funds and artwork for civil and/or criminal forfeiture:

   - Bank of America Checking account number 4570-3136-5040 in the name of KC Concepts II, LLC, or any funds known to have previously been maintained in account number 4570-3136-5040 (the "BoA Account 5040")

5. There is probable cause to believe that BoA Account 5040, currently or previously, is or contains property, real or personal, which constitutes or is derived from proceeds traceable to a specific unlawful activity, including but not limited to 18 U.S.C. § 1343 (Wire Fraud), and is property, real or personal, involved in a transaction or attempted transaction in violation of a money laundering offense, including 18 U.S.C. § 1956 and/or 1957 (Money Laundering); (b) are subject to seizure pursuant to 18 U.S.C. §§ 981(b) and 982(b)(1), and 21 U.S.C. § 853(e) and (f); and (c) are subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C) and 982(a)(1), and 28 U.S.C. § 2461.

6. Specifically related to BoA Account 5040, there is probable cause to believe that on or about May 31, 2019, in the District of Arizona, DEBBIE CORVO (CORVO) under direction from FRANK CAPRI (CAPRI), knowingly deposited a check from a title company for the sale of a property in the amount of around $734,849.75. The check was deposited into BoA Account 5040. The entire balance of BoA Account 5040 or the amounts of funds that were previously held in BoA Account 5040 is subject to seizure and forfeiture because it is property involved in a money laundering offense.

## BACKGROUND OF INVESTIGATION

7. On January 28, 2020, the grand jury in the United States District Court, District of Arizona, returned a 16 count indictment against CAPRI, CORVO, and Christian Burka, *United States v. Capri, et al.*, CR 20-00096-PHX-JJT (JZB). The 16 counts included wire fraud, 18 U.S.C. §1343, conspiracy to commit transactional money laundering, 18 § U.S.C. 1956(h), transactional money laundering, 18 U.S.C. § 1957, and conspiracy to commit wire fraud, 18 U.S.C. § 371. This seizure warrant application is related to the offenses charged in that criminal matter.

8. United States Magistrate Judge Michelle Burns previously issued a seizure warrant (21-028MB) for two Bank of America accounts, including BoA Account 5040, and I served the warrant on February 17, 2021. The BoA Account 5040 was closed in April 2020 but based on conversations with Bank of America employees they confirmed that the funds that were sent to the account holder when the account was closed had not yet been negotiated. The bank advised me to serve the warrant on BoA Account 5040 to prompt the bank to recall the funds and send a check to the government. Bank of America took several months to locate the funds within their institution and confirm that the account holder either never received the closing check or never cashed it. The funds never left Bank of America but were moved to an internal account closure holding account until the account holder negotiated the closing check. Recently, Bank of America cancelled the account closing check and moved the funds back into BoA Account 5040. However, since the original warrant was issued when the account was closed, Bank of America requested a new warrant be issued now that the account has been reopened. To cover the possible circumstance that Bank of America has not yet reestablished the old account and continues to hold the funds in a separate internal account, this new warrant has been worded to include the money that is currently in the account or was previously in the account at the time it was closed.

9. CAPRI was the owner and beneficiary of a number of businesses primarily associated with the operation of restaurants both in Arizona and across the United States. Despite CAPRI'S control and ownership of the various businesses, he was not formally listed as the owner on relevant incorporation and trust documentation associated with the businesses. The majority of the businesses were listed as owned by CAPRI's mother, CORVO, or other nominees with ties to CAPRI.

10. In or around 2008, CAPRI operated a business known as Capri Concepts, LLC that obtained a licensing agreement with musician T.K. to construct and operate branded restaurants bearing T.K. 's name ("Branded Restaurant") throughout the United States. The first Branded Restaurant associated with CAPRI was constructed with the assistance of CAPRI's longtime associate J.F. and was opened in Mesa, Arizona, in or around 2009.

11. By early 2011, CAPRI's business expanded to include five Branded Restaurants with many more locations scheduled for construction. CAPRI hired employees to assist with the expanding business including G.M. On or about January 26, 2011, G.M. incorporated Boomtown Entertainment, LLC, a Delaware corporation that acted as the parent organization overseeing the various Branded Restaurants. On August 25, 2011, Boomtown Management, LLC was incorporated as an umbrella entity to further consolidate the various restaurant entities and Boomtown Entertainment, LLC (collectively "Boomtown"). All the entities were collectively owned by a trust established in the name of CORVO, of which CAPRI was the beneficiary and G.M. acted as the trustee. Each individual Branded Restaurant location was incorporated under the name CRGE (location), which stands for Capri Restaurant Group Enterprises, with each restaurant having a separate bank account from the main Boomtown bank accounts. CORVO had signature authority on many of the Boomtown bank accounts.

12. With the assistance of a real estate broker, CAPRI worked directly with property development companies ("property developers") around the United States who had locations suitable for Branded Restaurant locations in order to negotiate the construction and lease agreements ("lease agreement contract") for each prospective restaurant location.

13. The lease agreement contracts included terms for the construction of each Branded Restaurant location including terms whereby the property developers would pay tenant improvement funds ("T.I. funds") to Boomtown for the construction of the restaurants according to a specific pre-negotiated schedule outlined in the lease agreement contract. Generally, the schedule included a payment of 10% at lease signing; a payment of 10% at the start of construction; a payment of 20% when construction was 25% complete; a payment of 20% when construction was 50% complete; a payment of 20% when construction was 75% completed; and a final payment of 20% upon completion or restaurant opening. The lease agreement contract also included a negotiated rent amount that Boomtown would owe to the property developers to operate the restaurant following construction and tied in part to the T.I. funds negotiated for construction.

14. It was understood between the parties that the T.I. funds payment structure and proposed schedule of disbursements were not typical, however, property developers were incentivized to have a Branded Restaurant as part of their development both as an anchor tenant and because the negotiated future rent payments were high and often included a percentage of expected restaurant revenue.

15. Boomtown expanded quickly from 2011 through 2014 resulting in construction of close to 20 locations around the United States with an additional approximately 24 locations under lease agreement contracts. By the end of 2012, despite representations by CAPRI to property developers that there were only plans to open four Branded Restaurants a year, Boomtown had begun construction on 12 locations in 12 different states. From late 2011 to 2012, CAPRI was signing approximately five to six new lease agreement contracts a month.

16. With CAPRI's knowledge and at his direction, Boomtown employees devised a scheme to obtain the T.I. funds associated with the lease agreement contracts for CAPRI' s personal use. In or around early 2011, CAPRI determined that Boomtown would self-perform construction effectively operating as its own general contractor on future projects in violation of the lease agreement contracts. From at least 2011 and continuing thereafter, CAPRI instructed G.M., J.F., and other Boomtown employees to fabricate certification of construction completion documentation ("draw paperwork") to submit to the property developers in order to induce the property developers to release T.I. funds. The fraudulent draw paperwork listed fabricated general contractors, fabricated subcontractors purporting to certify completed work, forged signatures, and false notary stamps in order to make the draw paperwork appear authentic. Boomtown employees referred to the creation of the draw paperwork as "arts and crafts."

17. With CAPRI's knowledge Boomtown employees incorporated the fabricated contracting businesses and set up Virtual Offices with addresses and telephone numbers in the event a property developer attempted to verify information listed on the fraudulent draw paperwork.

18. In or around early 2012, a property developer requested that Boomtown provide the original certified draw paperwork in order to release the final draw payment. CAPRI and Boomtown employees obtained a stamp machine in order to create wet notary stamps to use on the draw paperwork rather than using photocopies. The stamp machine was kept in the Boomtown office along with a bag of notary and signature stamps.

19. Between March 2012 and November 2014, Boomtown entered into approximately 24 lease agreements that entitled Boomtown to approximately $64,802,029.66 in T.I. funds for the construction of the Branded Restaurant locations. Based on Boomtown's submission of fraudulent draw paperwork, property developers released T.I. funds directly to the entities controlled by CAPRI or Boomtown bank accounts. After obtaining the T.I. fund deposits, CAPRI diverted money for his personal use including to make payments to CORVO and other family members. CAPRI also frequently directed employees including G.M. to divert funds out of the individual restaurant and main Boomtown bank accounts to his various personal accounts including a TD Ameritrade in the name of N & G Concepts, LLC opened in approximately December 2012. In addition, CAPRI instructed Boomtown employees to pay for his personal expenses directly from Boomtown bank accounts, individual Branded Restaurants'

bank accounts, utilized debit cards associated with the Boomtown bank accounts, or instructed employees to provide him with cash.

20. As a result of CAPRI's actions, there were insufficient funds to pay Boomtown's business expenses. In or around 2014, G.M. began transferring funds from CAPRI's personal TD Ameritrade account ending in X3197 back to Boomtown accounts, in part to pay Boomtown's expenses. Nevertheless, Boomtown was not able to cover costs and as a result, there were frequent construction delays on every project during which time CAPRI would not pay rent to property developers. In addition, CAPRI would not pay to continue operating opened Branded Restaurants including taxes, and often stopped paying ongoing construction and maintenance costs. Beginning in or around 2014 into 2015, various opened Branded Restaurants failed and construction stopped on a number of incomplete projects. By the end of 2014, new lease agreement contracts were infrequent and property developers began filing lawsuits naming CAPRI and Boomtown.

21. On January 9, 2015, with the assistance of G.M. and others, Arizona Universal Holding Management, LLC ("AUH") was incorporated in order to move financially viable Branded Restaurants out from under Boomtown listed in CORVO's name and associated with CAPRI. AUH was solely owned by the Arizona Universal Holding Management Irrevocable Trust ("AUH trust") that did not name CORVO, but to which CAPRI was the beneficiary and G.M. was the trustee. With CAPRI's knowledge, the prior transfers initiated by G.M. from the TD Ameritrade account ending in X3197 were re-categorized as payments from AUH to "purchase" the viable Boomtown assets. Although the purported purchase occurred in 2015, the purchase documentation utilized the previously made transfers in 2014 from the TD Ameritrade account ending in X3197.

22. In or around January 2015, despite Boomtown's ongoing financial situation, CAPRI, G.M. and an associate named CHRISTIAN BURKA ("BURKA"), began negotiating to obtain a licensing agreement to construct and operate similar restaurants with R.F., a different music group ("Second Branded Restaurant"). The licensing agreement with R.F. was entered in or around April 2015. CAPRI's new business was incorporated under the name RF Holdings Group, LLC but was solely owned by RF Holdings Group Irrevocable Trust (collectively, "RF Holdings") held in the name of another CAPRI nominee in order to conceal CAPRI's beneficial interest; CORVO's name was not utilized in order to conceal the new business' connection to Boomtown related entities. Initially, CAPRI owned 70% of the new business, BURKA owned 20%, and G.M. owned 10%.

23. In or around early September 2015, CAPRI discovered that G.M. had embezzled funds and G.M. subsequently left the company. In February 2016, at the behest of CAPRI, G.M. and others created documentation substituting a CAPRI nominee in place of G.M. as 10% owner and manager of RF Holdings. Although the documents were actually executed almost one year later, the documents were backdated to reflect the date of the

original licensing and ownership agreements associated with the Second Branded Restaurants.

24. Between November 2015 and approximately November 2017, CAPRI, BURKA, and others negotiated lease agreement contracts to construct and operate Second Branded Restaurant locations including, amongst others, locations in Connecticut and Ohio. In CAPRI's place, BURKA and a CAPRI nominee held themselves out as the principals associated with each proposed Second Branded Restaurant to conceal CAPRI's involvement from property developers, landlords, and contractors. As a result, property developers entered into lease agreement contracts for the construction of the Second Branded Restaurants without knowing about CAPRI's involvement and RF Holding's association with Boomtown.

25. The structure of the Second Branded Restaurants' negotiated lease agreement contracts were substantially similar to the lease agreement contracts used for the Branded Restaurants although the contract prices were lower because the Second Branded Restaurants were designed to be smaller spaces. Like the Branded Restaurants, each new Second Branded Restaurant was incorporated individually as a RF Restaurant (Number), LLC, and had a separate bank account.

26. Although a CAPRI nominee opened each bank account associated with the Second Branded Restaurant locations, CAPRI and BURKA told the nominee when deposits into the various accounts were expected and directed the nominee as to all outgoing transactions associated with the accounts.

## PROBABLE CAUSE TO SEIZE FOR FORFEITURE

27. On or about May 31, 2019, CORVO with the assistance of TC opened BoA Account 5040 at the Bank of America Branch located at 20595 North Hayden Road, Scottsdale, AZ 85255.

28. BoA Account 5040 contains the proceeds from the sale of the penthouse condominium number 934 at Kierland Commons that CAPRI bought with the proceeds of his wire fraud offenses described above. The net amount of the sale that went to the owner after paying the mortgage and other fees was $734,849.75. A check from First Arizona Title Agency for $734,849.75 was issued to KC Concepts II, LLC, the listed owner of the property. The owner of KC Concepts II, LLC was CORVO, CAPRI's mother. CORVO signed the title agency documents to complete the sale of the property. When the title agency called CORVO to inform her that the check was ready for her to pick up she informed CAPRI. CAPRI instructed CORVO to give the title agency permission to release the proceeds check to him. CAPRI picked up the check from the title agency. CAPRI gave the check to his girlfriend, TC, and instructed her to take his mother, CORVO, to the bank and open a bank account in the name of KC Concepts II, LLC and deposit the check into the account. TC and CORVO went to Bank of America and opened BoA Account 5040 in the name of KC Concepts II, LLC. The title agency

check for $734,849.75 was deposited into the account. CORVO stated that the money belonged to CAPRI and she never spent any of the funds, received any bank statements or had any access to the account. CORVO was unaware of the entity called KC Concepts II, LLC and did not know that she was listed as the owner of the company and/or the condominium until CAPRI told her to sign the title agency documents for the sale. CAPRI was the actual owner of the condominium. CORVO did as CAPRI instructed and whenever she asked questions CAPRI told her not to worry about it. CORVO knew that it was not her property and not her company, but she did as CAPRI instructed. She trusted her son.

29. The condominium appears to have been purchased by CAPRI. The affidavit for purchase signed on June 13, 2012 appears to contain CAPRI's signature as a member of KC Concepts II, LLC. The majority of the down payment for the purchase of the condominium appears to have been made from the CRGE Illinois operating account. A wire transfer for $438,000 was sent to the title company for the purchase on June 12, 2012. CAPRI lived in the condominium for some time. The seller carried the loan and in 2015 two payments were made to the seller for $423,634 from the N&G account at TD Ameritrade. In 2015, the property also obtained a mortgage from FCI Lending Services for what appeared to be the remaining amount owed on the property. The monthly mortgage payments to FCI Lending Services were made from the CRGE Foxborough Operating Bank account with the exception the first two payments from the KC Concepts I bank account. The KC Concepts I bank account was funded from Boomtown accounts. The mortgage was transferred from FCI Lending to Seneca Mortgage Company in 2016. The monthly mortgage payments to Seneca Mortgage were paid from the Barley Irrevocable Trust bank account. The mortgage was sold to Planet Home in 2016 and the monthly mortgage payments to Planet Home were paid from the Barley Irrevocable Trust bank account. The total payments from the Barley Irrevocable Trust bank account to the two mortgage financers was $83,590.46 and $441,937.23 respectively. The balance of the outstanding mortgage with Planet Home was paid by the title company when the property was sold on May 29, 2019. The funds in the Barley Irrevocable Trust bank account were from various sources related to the Boomtown and RF entities described above and from an initial transfer deposit into the account from CORVO's account at Johnson Bank. CORVO stated that all the money in Johnson Bank belonged to CAPRI and she opened the account on his direction. She never used the account and did not know what money was in the account and how it was used. She never saw statements and did not access the accounts because it was not her money. There was a transfer to close out the N&G TD Ameritrade account discussed above for $836,989.25 to an account controlled by CORVO at Wells Fargo Bank which was immediately transferred to another account controlled by CORVO at Wells Fargo Bank. The $836,989.25 was withdrawn a few days later and deposited into an account that CORVO opened at Johnson Bank. The Barley Irrevocable Trust received a transfer from Johnson Bank for $1,238,604.56. CORVO said that she did not make the transfer and assumed that CAPRI did because it was his money.

30. The property appears to have been purchased and maintained using funds directly derived from the fraudulent activity alleged in the indictment and set forth in this affidavit. The ownership of the property and the sales transaction were conducted with an attempt to conceal the true owner and beneficiary of the asset. The BoA Account 5040 in the name of KC Concepts II, LLC received the proceeds of that property transaction in the amount of $734,849.75.

31. Therefore probable cause exists to support the issuance of a seizure warrant for BoA Account 5040 as it currently or previously contains property, real or personal, which constitutes or is derived from proceeds traceable to a specific unlawful activity, wire fraud, and it is property involved in a transaction or attempted transaction in violation of a money laundering offense.

## CONCLUSION

32. Based on my training and experience and the information set forth above, there is probable cause to believe that BoA Account 5040, currently or previously, is or contains property, real or personal, which constitutes or is derived from proceeds traceable to a specific unlawful activity, including but not limited to 18 U.S.C. § 1343 (Wire Fraud), and is property, real or personal, involved in a transaction or attempted transaction in violation of a money laundering offense, including 18 U.S.C. § 1956 and/or 1957 (Money Laundering); (b) are subject to seizure pursuant to 18 U.S.C. §§ 981(b) and 982(b)(1), and 21 U.S.C. § 853(e) and (f); and (c) are subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C) and 982(a)(1), and 28 U.S.C. § 2461.

Brad Palmer
Special Agent, IRS Criminal Investigation

Subscribed and sworn to before me

this 21 day of May, 2021.

Hon. Michael T. Morrissey
United States Magistrate Judge